Argued March 6, affirmed March 22, 1967

STATE OF OREGON, *Respondent, v.*
JANET LOUISE THORNTON,
*Appellant.*

425 P. 2d 529

*Dale Pierson,* Salem, argued the cause and filed a
brief for appellant.

*Gary D. Gortmaker,* District Attorney, Salem, argued the cause and filed a brief for respondent.

Before Perry, Chief Justice, and McAllister, Sloan, O'Connell, Goodwin, Denecke and Belloni, Justices.

BELLONI, J. (Pro Tempore).

Janet Louise Thornton, age 16, was indicted by the Marion County Grand Jury of the crime of Second Degree Murder for allegedly killing her 13 month old daughter.

At the arraignment the judge of the Circuit Court upon being advised of her age remanded the child to the Marion County Juvenile Court.

A Petition was filed in the Juvenile Court which alleged:

"2. The child is within the jurisdiction of the Court by reason of the following facts: Said minor child has violated a law of the state of Oregon, to-wit: intentionally caused the death of another human being; it is alleged that at and in the County of Marion, State of Oregon on or about the 18th day of October, 1965, said minor child by striking, beating and bruising the body of one Angie Ann Thornton did intentionally cause the death of said Angie Ann Thornton."

At the conclusion of a hearing the Juvenile Court judge's order contained the following findings and conclusions:

"In my opinion the evidence does not establish that Janet Louise Thornton intentionally committed the acts alleged in the petition. However, a preponderance of the competent evidence received establishes the facts alleged in the petition within

the provisions of subsection (3) of ORS 163.040①, defining a degree of homicide which is included in the greater alleged in the petition."

"In other words, the allegations of the petition that Janet Louise Thornton committed certain acts which resulted in death of the child even though not intentional were of such a nature that the death of the child was not justifiable or excusable."

"I hold that the preponderance of the competent evidence sustains the allegations of the acts alleged to have been committed by Janet Louise Thornton which caused the death of Angie Ann Thornton, establishes a lesser degree of homicide than alleged in the petition (manslaughter if the matter were in the criminal court)."

"I hold that the preponderance of the competent evidence brings Janet Louise Thornton within the jurisdiction of the Marion County Juvenile Court."

"Janet Louise Thornton is made a ward of the court."

Subsequently, she was committed to Hillcrest School for Girls, the girls' training school of the state of Oregon.

This appeal asserts that the Court erred (1) in denying her motion to dismiss the petition, and (2) in finding that she committed the acts which resulted in

---

① ORS 163.040 Manslaughter generally. (1) Any person who, without malice express or implied, without deliberation, and upon a sudden heat of passion caused by a provocation apparently sufficient to make the passion irresistible, voluntarily kills another, is guilty of manslaughter.

(2) Any person who, in the commission of any unlawful act, or a lawful act without due caution or circumspection, involuntarily kills another, is guilty of manslaughter. The provisions of this subsection shall not apply to the killing of any person where the proximate cause of such killing is an act or omission defined as negligent homicide in ORS 163.091.

(3) Every killing of a human being by the act, procurement or culpable negligence of another, when the killing is not murder in the first or second degree, or is not justifiable or excusable or negligent homicide as provided in ORS 163.091, is manslaughter.

the infant's death and that the acts were not justifiable or excusable.

The question presented for decision on appeal is whether the evidence is sufficient to support a finding that the child committed the act charged in the petition of causing the death of another human being; and, if so, if the evidence supports a finding that such death resulted from acts which were contrary to law.

This was a juvenile court proceeding brought under the Juvenile Code contained in ORS Chapter 419 which provides that the judge is the trier of the facts and that "the facts alleged in the petition showing the child to be within the jurisdiction② of the court . . ., unless admitted, must be established by a preponderance of the evidence."

Whether the differing purposes of a juvenile court③

---

② ORS 419.476 Children within jurisdiction of juvenile court. (1) The juvenile court has exclusive original jurisdiction in any case involving a person who is under 18 years of age and:

(a) Who has committed an act which is a violation, or which if done by an adult would constitute a violation, of a law or ordinance of the United States or a state, county or city; or

(b) Who is beyond the control of his parents, guardian or other person having his custody; or

(c) Whose behavior, condition or circumstances are such as to endanger his own welfare or the welfare of others; or

(d) Who is dependent for care and support on a public or private child-caring agency that needs the services of the court in planning for his best interests; or

(e) Either his parents or any other person having his custody have abandoned him, failed to provide him with the support or education required by law, subjected him to cruelty or depravity or failed to provide him with the care, guidance and protection necessary for his physical, mental or emotional well-being; or

(f) Who has run away from his home.

③ "The fundamental idea of the (juvenile court) law is that the state must step in and exercise guardianship over a child found under such adverse social or individual conditions as develop crime . . . It proposes a plan whereby he may be treated, not as a criminal, or legally charged with crime, but as a ward of the state, to receive practically the care, custody, and

and a criminal court together with the lesser burden of proof required in the former might alter the test of an appellate court to be applied when testing the sufficiency of the evidence, we need not here decide because the evidence adduced was sufficient to present a question of fact in a criminal manslaughter trial.

■■ The test to be applied when testing the sufficiency of circumstantial evidence is that the state must produce cogent and convincing evidence which must be inconsistent with any reasonable theory of innocence, but in passing upon the sufficiency of the evidence the appellate court does not weigh the evidence or resolve the conflicts. The appellate court must accept the state's evidence as true. *State v. Dean,* 241 Or 124, 404 P2d 797 (1965).

There was evidence from which the judge could have determined that:

In October of 1965, Janet Louise Thornton was 16 years of age. She was married at age 14 to Donald Thornton. Janet and Donald were the parents of Angie Ann Thornton, and Janet was several months pregnant. Donald Thornton was 20 years of age; and although physically able to work, he had never provided for his family in a normal manner. They lived on welfare assistance and money from Janet's mother, a Mrs. Alexander. They lived in a home which was also occupied by Mrs. Alexander and Mike Dietrich, a friend of Mr. Thornton's who had a room in the basement. The house was also occupied from time to

---

discipline that are accorded the neglected and dependent child, and which, as the act states, 'shall approximate as nearly as may be that which should be given by its parents'."

Roscoe Pound: The Juvenile Court and the Law. Yearbook, National Probation Association, 1944, pp. 13-14, citing report of the committee of the Chicago Bar Association in 1899.

time by Mr. Lyle Bowman, Mr. Thornton's step-father, who came to visit Mrs. Alexander.

Monday, October 18, 1965, at approximately 2:30 p.m., Angie Ann Thornton, age 13 months, was found dead in her crib in the bedroom of the house occupied by these persons. The time of death was fixed by the examining pathologist at approximately 11:00 a.m.; although the time could have been as early as 9:00 a.m. and as late as 2:00 p.m. No tests to fix the time of death with greater exactness were made. The child had been beaten severely about the body and head. The immediate cause of death was a rupture of the heart sack. The child's body was covered with contusions and abrasions of the skin of the head, neck, trunk and upper extremities. There was a laceration of the nose. The bruises found on the body were of varying ages. Some were as old as several days, and some were apparently made shortly before the time of death. The largest bruises which were of recent origin were on the back of the head and on the back. The pathologist who performed the autopsy testified that such a heart injury is traumatic in origin and is most often the result of falls from height, head-on collisions in motor vehicle accidents, impact injuries and severe crushing injuries with twisting and distortion of the chest. There were some broken bones in Angie's arms. One break had more calcium where the bone had healed and was older than the break in the other arm. The trial judge, in his opinion, described it as a classical example of the "battered child" syndrome.

Janet Thornton testified at the hearing that Donald left on Thursday, October 14, 1965 to go to Portland for an army physical. She did nothing on Thursday, Friday or Saturday except stay home and watch TV. On Sunday, October 17th, Janet went over to friends

and took Angie with her. Janet and Angie returned home Sunday evening. Angie slept in her crib in Janet's bedroom.

Janet testified that she got up about 8:00 a.m. on the morning of Angie's death. Neither of the three men dwellers were in the house. She got Angie up, bathed her, dressed her and fed her. Angie was in a normal condition at this time. About 9:00 a.m. Janet picked up Angie to take her back to her crib in the bedroom. In the process of taking Angie to the other room, Janet says she slipped on some toys on the floor, went six or seven feet across the room and fell partially in the bedroom. Janet fell with most of her weight on Angie. The fall caused Angie to vomit. Janet says she picked Angie up, changed her clothes and put her in her crib, as she appeared uninjured.

Janet then cleaned up the house and watched television, being always in a position where she could see anyone who might come or go. She saw no one. She watched TV until her mother got up at about 11:30 a.m. Sometime after her mother got up, Janet went into the bathroom to bathe and dress. Her mother was in the kitchen fixing something to eat. About 12:45 p.m., while Janet was in the bathroom, Donald came home. He spoke to Janet and went to the bedroom. Mrs. Alexander was washing dishes. Janet came out of the bathroom and went into the bedroom. Janet and Donald had intercourse on the bed near Angie's crib. About 2:30 p.m. Donald asked where Angie was and Janet said she was in the crib taking her nap. Donald got up, looked at Angie and discovered she was dead.

Janet stated that she was the one who cared for Angie and that she was the only one who had cared

for the child in the last month. She testified she bathed the child every day, including the day the child died, and had not noticed the bruises shown by the pictures with one small exception. Janet specifically said she had not seen a large bruise in the middle of the child's back or a large bruise on the child's buttocks. A doctor testified that the large bruise on the child's buttocks was several days' old. Janet testified that, other than the fall, there was no way she knew of that Angie could have been injured.

On the day of the child's death, Janet gave a statement to the police. On October 20th she gave a similar statement to the police and on October 21st she read and signed the statement she had given. In this early statement Janet said she had been walking Angie along, holding her hand, and that Angie had fallen down. She told her husband this same story, and then several weeks later, she changed to the story given at the hearing, of falling on top of Angie. Janet's statements also differ in respect to the time she got up on October 18th; from 10:30 a.m. in the first statement to 8:00 a.m. She also claims to have fed the baby cereal on the 18th; however, a doctor testified that the only thing in the baby's stomach was milk.

■ Appellant argued that the evidence points with equal force to other persons who had the same access, ability and opportunity to inflict injury upon the infant, Angie Ann Thornton. We do not agree, but our view of the weight of the evidence and the inferences to be drawn therefrom are not important. The trial judge believed that the evidence proved the defendant was guilty of killing her daughter unintentionally but without excuse or justification. We are bound by his findings to the same degree as if it were a jury finding.

■ There was no error in denying the motion to dismiss the petition or in finding that Janet Louise Thornton committed the acts or in finding that the acts were not justifiable or excusable.

Affirmed.

GOODWIN, J., dissenting.

The trial court specifically found no evidence that the juvenile intentionally battered her baby. There was no more evidence that she battered the baby as an act of "culpable negligence." The injuries were such that whoever inflicted them necessarily inflicted them intentionally. The evidence connecting the juvenile with the death of the child was extremely thin, and amounted only to suspicious circumstances. The juvenile's refusal to explain what happened could mean that she battered the baby or that she wanted to protect some other person. Someone battered the baby, but the only evidence that the juvenile before the court did so was the fact that the juvenile was the person in exclusive control of the child when it died. Any conclusion that she inflicted the fatal wounds, negligently or otherwise, is highly speculative.

I dissent.